IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID T. HARRIS, | ) | CASE NO. 3:13CV01622 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff David T. Harris ("Harris") seeks judicial review of the final decision of
Defendant Commissioner of Social Security ("Commissioner") denying his application for
Supplemental Security Income benefits ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to
42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the
consent of the parties.  Doc. 16.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.


**I.  Procedural History**

Harris filed his application for SSI on September 17, 2007, alleging a disability onset date
of September 1, 2007.  Tr. 182, 225.  He alleged disability based on the following:  "High
[blood] pressure, hearing voices, I talk to myself, obes[ity], edema swelling on my ankles,
headaches all day long."  Tr. 229.  After denials by the state agency initially (Tr. 48, 92) and on
reconsideration (Tr. 49, 95), Harris requested an administrative hearing.  Tr. 98-100.  A hearing
was held before Administrative Law Judge ("ALJ") Dierdre R. Horton on September 16, 2009.

1

Tr. 31-47.  In her December 10, 2009, decision (Tr. 51-68), ALJ Horton determined that Harris' residual functional capacity ("RFC") did not prevent him from performing work existing in significant numbers in the national economy, i.e., he was not disabled.  Tr. 63.  Harris requested review of ALJ Horton's decision by the Appeals Council.  Tr. 142.  On November 1, 2010, the Appeals Council remanded Harris' case back to an ALJ.[1]  Tr. 69-71.

On January 17, 2012, a second hearing was held before ALJ Lawrence Levey.  Tr. 11-30. In his February 10, 2012, decision (Tr. 72-91), ALJ Levey determined that Harris' RFC did not prevent him from performing work existing in significant numbers in the national economy, i.e., he was not disabled.  Tr. 85.  On April 4, 2012, Harris requested review of ALJ Levey's decision by the Appeals Council (Tr. 9-10) and on June 4, 2013, the Appeals Council denied Harris' request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5. Harris is currently appealing from the February 10, 2012 decision.

## II. Evidence

### A. Personal and Vocational Evidence

Harris was born in 1965 and was 42 years old on the date his application was filed.  Tr. 85.  Harris has a high school equivalent education.  Tr. 85, 381, 456.  He has no past relevant work.  Tr. 85.

---

[1] The Appeals Council stated that they were remanding the matter back to the ALJ for resolution of the following issue:

> The hearing decision found that claimant had the RFC "to perform medium work…except he is limited in his ability to relate appropriately to others, such that he can only have superficial contact with co-workers, supervisors, and the general public." (Decision, Finding 4).  The term "superficial" is not defined and does not usefully convey the extent of the claimant's social limitations.  Additionally, there is no vocational evidence in the record regarding the extent to which the claimant's nonexertional limitations erode the medium occupational job base.

Tr. 70.

**B. Medical Evidence[2]**

Harris has no history of psychiatric hospitalizations.  Tr. 457.    He first sought treatment for mental health issues at Zepf Community Mental Health Center ("Zepf") in May 2008, complaining of depression and auditory hallucinations.[3]  Tr. 453.  At the initial assessment, Joseph Habib, a licensed social worker, observed that Harris was unkempt, with average eye contact, motor activity, and speech.  Tr. 468.  His thought process was logical, he was cooperative, and he had normal cognition.  Tr. 468.  Habib found Harris to be moderately depressed and assigned him a global assessment of functioning score ("GAF") of 55.[4]  Tr. 466, 468.

On June 2, 2008, Harris began treatment with psychiatrist Nagaveni Ragothaman, M.D.  Tr. 449.  Harris reported that he had difficulty sleeping for years stemming from an attack in prison while he was sleeping.  Tr. 449.  He stated that his sleeplessness had gotten worse after his mother died in 2004. Tr. 449.  He also reported depression, irritability, hearing voices, and a low frustration tolerance.  Tr. 449.  He stated that he avoids people.  Tr. 449.  Upon mental examination, Harris maintained good eye contact and was cooperative, although he was sad and in tears.  Tr. 450.  Dr. Ragothaman noted that Harris did not seem to respond to internal stimuli such as hallucinations during the appointment.  Tr. 450.  She found that Harris was alert and oriented, and could complete serial sevens (subtracting from 100 in series of seven), spell

---

[2] Harris only challenges the ALJ's findings with respect to his mental health impairments.  Accordingly, only the medical evidence relating to those claims is summarized herein.

[3] Harris' initial assessment format Zepf indicates that he was "self[-]referred as suggested by [Ohio Department of Job and Family Services]."  Tr. 465.

[4] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

backwards, and recall three objects after five minutes.  He could think abstractly and had average intelligence, although she described his insight and judgment as poor. Tr. 450.  She diagnosed depressive disorder and antisocial personality disorder and assigned Harris a GAF of 45.[5]  Tr. 450.  She prescribed the medication Trazodone to help with sleep and recommended individual therapy. Tr. 451.

Harris saw Dr. Ragothaman again on June 30, 2008.  Tr. 441.  He reported depressive symptoms, paranoid thoughts, and auditory hallucinations.  Tr. 441.  He stated that he planned to go to California. Tr. 441.  Dr. Ragothaman described him as appropriately dressed with good eye contact and normal speech. Tr. 441.  She found him to be irritable but cooperative. Tr. 441.  She observed that Harris did not appear to respond to internal stimuli such as hallucinations during his appointment.  Tr. 441.

On August 25, 2008, Harris reported that the Trazodone was helping him sleep. Tr. 434.  He stated that he went to California for about a month and stayed with his sister. Tr. 434.  He reported paranoid thoughts and auditory hallucinations.  Tr. 434.  Dr. Ragothaman opined that his eye contact was good and that he was cooperative, although his speech was pressured at times and he was irritable.  Tr. 434.  She also observed that he did not appear to respond to internal stimuli such as hallucinations during his appointment. Tr. 434.

On December 5, 2008, Harris telephoned Zepf. Tr. 430.  He "presented stable and well-oriented"; denied psychiatric problems; and had "questions about establishing [a] record of treatment for SSI, Medicaid."  Tr. 430.

Harris next saw Dr. Ragothaman on January 5, 2009.  Tr. 428.  He reported that he had been in Las Vegas for two months staying with his sister. Tr. 428.  He described his family as

---

[5] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  DSM-IV-TR at 34.

close-knit.  Tr. 428.  He complained about being depressed and irritable,  and indicated increased depression due to the holiday season and recent deaths in his family.  Tr. 428.  Dr. Ragothaman described him as being appropriately dressed for the weather, having good eye contact, and being cooperative.  Tr. 428.  She observed that he did not appear to respond to internal stimuli such as hallucinations during his appointment.  Tr. 428.

Harris returned to Zepf on September 3, 2009, after being discharged for missing several appointments.  Tr. 537.  He reported a history of depression since 2004 after the death of his mother.  Tr. 537.  He complained of being paranoid and unable to sleep.  Tr. 537.  Upon mental examination,  Harris was found to be cooperative and responsive,  with a goal-directed thought process.[6] Tr. 544.  He had fair eye contact and was oriented to person, place, and time.  Tr. 544.  He was able to spell backwards and forwards and complete serial sevens without difficulty.  Tr. 544.

Dr. Ragothaman saw Harris on September 18, 2009.  Tr. 534-536.  Upon mental examination,  Dr. Ragothaman described Harris as cooperative with good eye contact, albeit with a blunted affect. Tr. 536.  She noted that Harris did not appear to respond to internal stimuli such as hallucinations during the appointment.  Tr. 536.  He was alert, and was able to complete serial sevens and spell backwards.  Tr. 536.  He was able to recall two objects after five minutes and a third object with a clue. Tr. 536.  Dr. Ragothaman rated Harris as having average insight, judgment, and an average intelligence level.  Tr. 536.  She diagnosed major depressive disorder, recurrent, severe, with psychotic features; a mood disorder; post-traumatic stress disorder;

---

[6]  The name of the individual assessing Harris on September 3, 2009, is illegible.  Tr. 547.

polysubstance  dependence,  in  remission;  and  anti-personality  disorder.  Tr. 536.  She assessed a GAF of 45.  Tr. 536.  She prescribed Celexa, Abilify,  and Desyrel.[7]  Tr. 536.

A nurse assessed Harris on November 8, 2010.[8]  Tr. 532.  Harris reported auditory hallucinations,  paranoia, and poor concentration.  Tr. 532.  The nurse listed Harris as alert and oriented,  with good hygiene  and eye contact, clear speech, and goal-directed  thought.  Tr. 532.  The nurse opined  that Harris' mood was depressed, anxious,  and irritable.  Tr. 532.

On November 9, 2010, Harris complained  to Dr. Ragothaman that he continued  to hear voices and that the voices were telling  him negative  comments  about Dr. Ragothaman.  Tr. 531.  Dr. Ragothaman opined  that Harris did not appear to respond to internal stimuli  such as hallucinations  during  the appointment.  Tr. 531.  She found him cooperative,  with good eye contact, and stable affect and speech.  Tr. 531.  At that time, Harris was taking  Geodon, Lexapro, Cogentin,  and Ambien.[9]

On January 7, 2011, Harris reported that his medications  were beneficial,  stating,  "I feel a lot better."  Tr. 528.  His sleep problems  had improved.  Tr. 528.  He was still hearing  voices but tried to block them out.  Tr. 528.  Dr. Ragothaman noted that his eye contact was good and that he was cooperative  with normal speech.  Tr. 528.  His affect was anxious  because of car trouble he had that morning,  but was otherwise stable.  Tr. 528.  He did not appear to respond to internal stimuli  such as hallucinations  during  the appointment.  Tr. 528.  Harris' last two records created

---

[7]  Celexa and Desyrel are antidepressants.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012,  at 312, 366, 501, 1957.  Abilify is an antipsychotic  medication.  *Id.* at 3, 132.

[8]  Other than a Zepf treatment note signed by Janecki dated September 14, 2010 (Tr. 533), there are no records spanning September 2009 and November 2010.

[9]  Geodon is an antipsychotic  medication.  *See* Dorland's, at 772, 2092.  Loxapro is an antidepressant.  *Id.* at 646, 1032.  Cogentin is an antidyskinetic used to treat tremors and muscular rigidity, including drug-induced reactions.  *Id.* at 209, 382, 1383.  Ambien is prescribed for sleeplessness.  *Id.* at 57, 2092.

by nursing staff at Zepf, dated February 22, 2011 (Tr. 523) and May 24, 2011 (Tr. 516), contained similar findings as previous records described above.

### C.  Medical Opinion Evidence

#### 1.  Treating Source

On June 17, 2011, treating psychiatrist Dr. Ragothaman completed a medical source statement form on Harris' behalf.  Tr. 548-49.  She indicated marked limitation in Harris' ability to independently, appropriately, and effectively, on a regular and sustained basis: (1) remember, understand, and follow simple directions; (2) maintain attention and concentration for two hour periods of time; (3) perform work activities at a reasonable pace; (4) keep a regular work schedule and maintain punctual attendance; (5) interact appropriately with others; (6) withstand stress and pressures of routine simple unskilled work; and (6) make judgments commensurate with the functions of unskilled work.  Tr. 548-49.

#### 2.  Other Source

On June 15, 2011, Judith Janecki, a licensed social worker at Zepf, also completed a medical source statement on Harris' behalf.  Tr. 550-51.  Like Dr. Ragothaman, Janecki indicated marked limitation in all categories.  Tr. 550-51.  She additionally explained that Harris "hears voices even while on medication"; "is easily distracted due to the auditory hallucinations"; and "is irritated easily by people and has low frustration tolerance."  Tr. 550-51. She opined that she "does not feel [Harris] is able to work due to paranoia, auditory hallucinations, irritability, and limited education."  Tr. 551.

#### 3.  Consultative Examiners

##### a. Daniel Watkins, Ph.D.

On November 29, 2007, Dr. Watkins conducted a psychological consultative examination.  Tr. 378-384.  Upon mental status examination, Dr. Watkins observed that Harris was stylishly dressed and well-groomed.  Tr. 378.  He described Harris as cooperative with good eye contact. Tr. 378.  He also described Harris' mood as irritable.  Tr. 379.  He opined that Harris' "[a]bility to sustain attention and concentration was adequate for the purposes of the evaluation, and appears to be adequate for the purposes of an ordinary eight-hour day." Tr. 378.

Harris reported frequent crying spells and recent vague homicidal ideation. Tr. 379.  He stated that he preferred not to interact with others.  Tr. 379.  He recounted auditory and visual hallucinations that sometimes last all day, although Dr. Watkins observed that Harris did not appear to respond to internal stimuli at the time of the examination.  Tr. 379.  Dr. Watkins, in summary, opined that Harris had marginal impulse control, marginal to poor insight, marginal judgment, and rated poor for reality testing.  Tr. 382.

Dr. Watkins diagnosed Harris with schizoaffective disorder and antisocial personality disorder.  Tr. 383.  He assessed a GAF score of 30 based on Harris' auditory and visual hallucinations.[10]  Tr. 383.  He found that Harris was not significantly limited in his ability to understand and follow simple instructions or to maintain attention to perform simple, repetitive tasks. Tr. 383.  He rated Harris' ability to withstand the stress and pressure of daily work as markedly impaired.  Tr. 383.  Dr. Watkins noted that Harris had not received psychiatric treatment at the time of the assessment; that Harris had no medical treatment records; and that "all the information given below is as per the claimant's self-report, except where otherwise indicated."  Tr. 378, 383.

---

[10] A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)." *See* DSM-IV-TR at 34.

### b. Christopher Layne, Ph.D.

On November 12, 2009, Dr. Layne conducted a psychological consultative examination. Tr. 471-476. Upon mental status examination, Dr. Layne observed that Harris had no signs of anxiety, paranoid trends, delusions, or hallucinations. Tr. 474. Although Harris produced an IQ score of 64, which indicates mild retardation, Dr. Layne opined that the score was inconsistent with Harris' schooling and vocabulary. Tr. 471, 474. Dr. Layne diagnosed Harris with polysubstance dependence, perhaps in remission, and antisocial traits. Tr. 475. He assessed a GAF of 81, which is normal. Tr. 475. Referring to Dr. Watkins' report, Dr. Layne stated, "[r]ecently a psychologist diagnosed Mr. Harris with an anti-social personality but Mr. Harris also convinced that psychologist that he suffered schizoaffective disorder. That second diagnosis is obviously false. Even the psychologist noted that Mr. Harris behaved rationally and Mr. Harris behaved rationally for me as well." Tr. 475.

With respect to work-related mental abilities, Dr. Layne opined that Harris was not impaired in his ability to: understand and follow instructions; maintain attention to simple, repetitive tasks; relate to others, including coworkers; and withstand day-to-day work stress. Tr. 475.

### 4. State Agency Reviewing Psychologists

### a. Karen Stailey-Steiger, Ph.D.

On January 11, 2008, Dr. Stailey-Steiger reviewed Harris' records. Tr. 386-88. Regarding Harris' functional capacity, Dr. Stailey-Steiger opined that Harris was capable of: (1) performing tasks that do not require independent prioritization or more than daily planning; (2) can interact occasionally in situations that do not require resolving conflict or persuading others to follow demands; (3) can interact occasionally and superficially and receive instructions

and ask questions  appropriately  in a work setting; and (4) can cope with the ordinary and routine changes in a work setting that are not fast paced or of high demand.  Tr. 388.

### b. Caroline Lewin, Ph.D.

On July 8, 2008, Dr. Lewin reviewed the evidence and Dr. Stailey-Steiger's  findings,  and affirmed Dr. Stailey-Steiger's  assessment.  Tr. 424.

## D.  Testimonial Evidence

### 1.  Harris' Testimony

Harris was represented by counsel and testified at the administrative  hearing.  Tr. 16-25. He stated that he lived  in a house by himself.  Tr. 16.  He testified that he cooks for himself and that his brother takes him shopping  for food once a month.  Tr. 24-25.

Harris stated that he hears voices constantly.  Tr. 17.  The voices tell him to harm people and "be derogative, you know, tear my self-esteem down."  Tr. 18.  He agreed that his medication helps calm down the voices somewhat and that, if he did not take medication, he would "probably  be in jail or something,  or dead."  Tr. 18.  Harris also advised that he does not like  being in crowds.  Tr. 18.  He explained  that he tries to stay away from people  because he will  hear voices telling  him to harm them.  Tr. 18.

Regarding his work history, Harris recounted that he had only two or three jobs in his life and that he last worked in 2000.  Tr. 19.  He had problems  working  because he would get in arguments with supervisors  and coworkers.  Tr. 19.  He stated that he has "a conflict  of interest" with bosses because they will  "try to get me to do things  a certain way, and I see it, doing  it, another way."  Tr. 21.  He testified that he spends most of his time alone in his house, and that he sleeps most of the day because his medications  make him drowsy.  Tr. 19-20.  He also reported that he sometimes has difficulty  sleeping  because he is paranoid and afraid of being attacked.  Tr.

23. Harris stated that his condition has not changed since his last administrative hearing in 2009. Tr. 16.

### 2. Vocational Expert's Testimony

Vocational Expert Samuel Edelman ("VE") testified at the hearing. Tr. 25-28. The ALJ asked the VE to determine whether there was any work that a hypothetical individual of Harris' age, education, and work experience and with the following characteristics could perform: either medium, light or sedentary exertional level; can stand and walk for 30 minutes at one time; stand and/or walk for a total of four hours in an eight-hour workday; can sit for a continuous period of 60 minutes at one time and can sit for four hours total in an eight-hour workday; can occasionally lift and carry up to 50 pounds, and can frequently lift and carry up to 20 pounds; can occasionally balance; frequently finger, handle, reach, and twist; occasionally climb stairs or steps; frequently walk on uneven ground; operate hand controls, foot controls, and motor vehicles; work around hazardous machinery; tolerate heat, cold, and environmental irritants; cannot climb ladders, ropes, or scaffolds; cannot kneel, crouch, or crawl; can occasionally stoop; is limited to performing simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements that involve no more than occasional interpersonal interaction with the general public, coworkers, and supervisors; and requires a job primarily working with things or objects, rather than people. Tr. 26-27. The VE testified that there were no jobs at the medium exertional level with a sit/stand option. Tr. 27. He stated that light jobs with a sit/stand option would include the following: assembly worker (143,000 national jobs, 1,900 Ohio jobs); sorter/graders (37,000 national jobs; 1,500 Ohio jobs); and packing worker (25,000 national jobs; 600 Ohio jobs). Tr. 27.

Next, the ALJ asked the VE if there were any occupations a hypothetical individual could perform having the same age, education, abilities, and limitations "set forth in [Harris'] testimony today." Tr. 28-29.  The VE responded that there would be no jobs that such an individual could perform. Tr. 29.

### III.  Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[11] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

In his February 10, 2012, decision, the ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since September 10, 2007, the application date.  Tr. 77.

2.      The claimant has the following severe impairments:  obesity, hypertension, depressive disorder, polysubstance abuse in remission by self-report, post-traumatic stress disorder, and antisocial personality disorder.  Tr. 77.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[12]  Tr. 78.

---

[11] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

4.      The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except that he can stand and/or walk for 30 minutes at a time, for a total of 4 hours in an 8 hour workday, can sit for 60 minutes at one time, for 4 hours total in an 8 hour workday, can occasional[ly] lift and carry up to 50 lbs, and can frequently lift and carry up to 20lbs, can only occasionally engage in balancing, can frequently engage in fingering, handling, reaching, and twisting, can only occasionally climb stairs or steps, and can frequently walk on uneven ground, operate hand controls, operate foot controls, work around hazardous machinery, operate motor vehicles, tolerate heat, cold, and environmental irritants. In addition, the claimant is precluded from climbing ladders, ropes, or scaffolds, can only occasionally engage in stooping, is precluded from kneeling, crouching, and crawling, and is limited to performing simple, routine, and repetitive tasks, in a work environment free of fast paced production requirements, involving no more than occasional interpersonal interaction with the general public, coworkers, and supervisors, and requires a job working primarily with things or objects, rather than with people. Tr. 79.

5.      The claimant has no past relevant work. Tr. 85.

6.      The claimant was born [in 1965] and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 85.

7.      The claimant has at least a high school education and is able to communicate in English. Tr. 85.

8.      Transferability of job skills is not an issue because claimant does not have past relevant work. Tr. 85.

9.      Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 85.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since September 10, 2007, the date the application was filed. Tr. 86.


## V. The Parties' Arguments

14

Harris objects to the ALJ's decision on two grounds.  He asserts that the ALJ erred in his evaluation of treating source opinions.  He also argues that the ALJ's RFC finding is not supported by the state agency reviewing physician evidence relied upon by the ALJ.

In response, the Commissioner submits that the ALJ reasonably evaluated all medical source opinion evidence and that his RFC finding accounted for the state agency opinion.

## VI.  Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ reasonably evaluated the treating source opinion evidence

Generally, an ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  "If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are

sufficiently  specific  to make clear to any subsequent reviewers  the weight  given to the treating

physician's  opinion  and the reasons for that weight.  *Id.*  In deciding  the weight  given,  the ALJ

must consider factors such as the length,  nature,  and extent of the treatment relationship;

specialization  of the physician;  the supportability  of the opinion;  and the consistency of the

opinion  with the record as a whole.  *See* 20 C.F.R. § 416.927(a)-(d);  *Bowen v. Comm'r of Soc*

*Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

       The ALJ did not err in giving  little  weight to Dr. Ragothaman's opinion.  Dr.

Ragothaman's opinion  consisted of boxes checked off on a medical source statement form,

without  further comment, indicating  that Harris had marked limitations  in his ability  to:

remember, understand,  and follow  simple  directions;  maintain attention and concentration  for

two-hour periods of time;  perform work activities  at a reasonable pace; keep a regular work

schedule and maintain  punctual attendance;  interact appropriately  with others;  withstand the

stresses and pressures of routine simple  unskilled  work;  and make judgments  that are

commensurate with the functions  of unskilled  work.  Tr. 548-49.  The ALJ explained that Dr.

Ragothaman's opinion  "is a form report offered without  even the pretense of objective  support,

appears to be based largely upon [Harris'] subjective  and unsupported  allegations,  and is

contrary to the record as a whole,  including  the contemporaneously  prepared treatment records."

Tr. 83.

       "Form reports in which a physician's  obligation  is only to check a box or fill  in a blank

are weak evidence at best."  *Mason v. Shalala*, 994, F.2d 1058,  1065 (3d Cir. 1993).  *See also*

*Rogers v. Comm'r of Soc. Sec.*, 225 F.3d 659 (6th Cir. 2000) (ALJ did not err in failing  to credit

treating source opinions  that failed to explain the reasons why certain boxes in the report forms

were checked off).  Moreover, as described in more detail below, the ALJ identified  evidence

that supported his finding that Dr. Ragothaman's opinion of marked limitations was based on Harris' subjective allegations and were contrary to the record as a whole, including Dr. Ragothaman's own treatment records.  *See Curler v. Comm'r of Soc. Sec.*, 561 Fed. App'x 464, 471-72 (6th Cir. 2014) (ALJ reasonably gave less than controlling weight to the form filled out by plaintiff's treating psychiatrist, consisting solely of checked boxes with no explanations, because it was contrary to the record as a whole, including that doctor's own treatment records).

### 1.  Subjective and unsupported allegations

The ALJ explained that he gave less weight to Dr. Ragothaman's opinion because it was based on Harris' subjective and unsupported allegations (Tr. 83), which the ALJ found not credible "in light of a number on inconsistencies in the record." Tr. 80.  For example, at his first administrative hearing, Harris testified that he had not used illegal drugs since 1992. Tr. 80, 43-44.  At his second hearing, he stated that he smoked marijuana in 2006 (Tr. 80, 22), and a treatment record from September 2007 revealed daily marijuana use (Tr. 80, 340).  The ALJ also pointed out a discrepancy in Harris' stated reasons for separating from his last job.  Tr. 80. During his first hearing, Harris explained that he was fired because he missed too many days. Tr. 80, 44.  Yet Harris told a social worker at Zepf that he quit because he "got tired" (Tr. 80, 456) and, at the second hearing, Harris remarked that he was fired because he "cussed the boss out" (Tr. 80, 22).  Finally, the ALJ pointed out that, in December 2008, Harris reported no psychiatric problems but questioned the social worker at Zepf about "establishing a record of treatment as related to applying for SSI, Medicaid."  Tr. 81, 430.

The ALJ also found Harris "less than fully credible regarding his allegations of frequent auditory hallucinations and the effect of these hallucinations on his daily functioning."  Tr. 81. Despite Harris' reports of hallucinations, no medical source ever witnessed Harris responding to

any internal stimuli.  Tr. 81, 379, 428, 434, 441, 450, 471.  The ALJ also discussed Dr. Layne's observation that Harris' credibility was "minimal" and that he was "blatantly exaggerat[ing]." Tr. 84, 471, 475.  For example, although Harris reported that he had no friends, he was driven to and picked up from the appointment by a friend.  Tr. 80, 471.  Dr. Layne noted that Harris scored 64 on an IQ test but that the low score was inconsistent with Harris' schooling and vocabulary. Tr. 80, 471.  Dr. Layne concurred with Dr. Watkins' diagnosis of anti-social behavior, but called Dr. Watkins' schizoaffective disorder diagnosis "obviously false." Tr. 84, 475.

### 2.  Other evidence in the record

The ALJ also pointed to substantial evidence in the record contrary to Dr. Ragothaman's opinion that Harris was markedly limited in all categories.  Tr. 83.  For example, consultative examiner Dr. Watkins found Harris to be "polite, cooperative, and socially appropriate." Tr. 84, 382.  Dr. Watkins also noted that Harris did not appear to respond to internal stimuli, such as hallucinations, and did not appear to be anxious.  Tr. 84, 379.  Dr. Watkins further detailed that Harris lived independently and performed all self-care skills and domestic activities, maintained supportive family relationships, and had no indications of a thought disorder.  Tr. 84, 379, 381. He indicated that Harris had an adequate ability to sustain attention and concentration during the examination and for an eight-hour workday.  Tr. 81, 378.

Harris argues that the ALJ "ignored the fact that the opinions of Dr. Ragothaman and Ms. Janecki were not inconsistent" with Dr. Watkins' opinion that Harris had marked limitations in his ability to relate to others and handle stress. Doc. 19, p. 17.  Contrary to Harris' argument, the ALJ considered Dr. Watkins' opinion and explained why he gave it little weight—Dr. Watkins' opinion, like Dr. Ragothaman's opinion (Tr. 83), "was based primarily on [Harris'] subjective

reports of auditory and visual hallucinations,  was inconsistent  with Dr. Watkins' own observations,  and was viewed by an examining  psychologist  as being unreliable."  Tr. 84.

Consultative  examiner Dr. Layne described Harris as showing  a confident  long-term mood.  Tr. 81, 473.  He indicated that Harris showed no signs of depression,  guilt, or anxiety. Tr. 81, 473.   He observed Harris "chatting  happily  with the secretaries," and stated, "[t]his is not a person who dislikes  being around people."  Tr. 81, 473.  He noted that Harris had an excellent vocabulary  and was able to complete  a four-page form without  difficulty.   Tr. 81, 474. Regarding  Harris' reports of hallucinations,  Dr. Layne observed that Harris behaved rationally and displayed  no convincing  signs of psychosis.  Tr. 81, 471.   Harris submits  that the ALJ's reliance on Dr. Layne's opinion  was misplaced  because Dr. Layne's opinion  "conflicted  with those of the other sources."  Doc. 19, p. 17.  This argument has no merit.  The ALJ, consistent with the explanations  repeatedly set forth in his decision  (Tr. 81, 83, 84), relied on Dr. Layne's opinion,  which disagreed with the diagnosis  of schizoaffective  disorder, because the diagnosis "was based solely on [Harris'] subjective  complaints,  rather than any objective,  clinical findings."  Tr. 84.

Lastly, the ALJ identified  the opinions  of the state agency reviewing psychologists,  Dr. Stailey-Steiger  and Dr. Lewin, as being consistent  with the objective  findings  reflected in Harris' treatment records and the consultative  examiner reports.  Tr. 83, 386-388,  424.

### 3.  Contemporaneously prepared treatment records

The ALJ discussed, in detail, Dr. Ragothaman's  contemporaneous  treatment records that he found inconsistent  with Dr. Ragothaman's  opinion.  For example, the ALJ noted that Dr. Ragothaman always described Harris as "cooperative."  Tr. 80, 428, 434, 441, 450.  He explained that she found Harris to have "average intelligence,  oriented  in all spheres, able to perform serial

7's, and complete memory testing with little difficulty." Tr. 81, 536. Her treatment notes consistently stated that Harris did not appear to respond to any internal stimuli such as hallucinations during the appointment. Tr. 81, 428, 434, 441, 450, 528, 531, 536. Additional treatment notes from Zepf described Harris as "fairly stable" and "stable and well oriented." Tr. 80, 433, 430.

In sum, in accordance with the treating physician rule, the ALJ properly evaluated the treating source opinion of Dr. Ragothaman and explained why he gave Dr. Ragothaman's opinion little weight.

### B. The ALJ reasonably evaluated the "other source" opinion evidence

Harris argues that, unlike Dr. Ragothaman, Harris' therapist, Judith Janecki, did provide explanatory information on her medical source statement form. Doc. 19, p. 16-17. Janecki is a licensed social worker and is not considered an accepted medical source. *See* 20 C.F.R. § 416.913(a) (identifying acceptable medical sources). Rather, a licensed social worker is an "other source." 20 C.F.R. 416.913(d). The Commissioner "may" use evidence from "other sources" to show the severity of the claimant's impairments. *Id.* When evaluating other source evidence, the Commissioner applies the factors outlined in 20 C.F.R. § 416.927. *Id. See also* Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *2 (2006). These factors include the other source's: examining relationship; treating relationship, including the length, nature and extent of the treatment relationship; the supportability of the source's opinion; the consistency of the opinion with the record as a whole; whether the source is a specialist, and any other factors raised by the claimant. 20 C.F.R. § 416.927(c).

Here, the ALJ evaluated Janecki's opinion and explained why he rejected it. He stated that her report "suffers from essentially the same deficiencies as that of Dr. Ragothaman." Tr.

83.  Although Harris points out that Janecki's form opinion, unlike Dr. Ragothaman's, included

narrative explanations, Harris fails to explain how Janecki's opinion is not deficient in the other

ways described by the ALJ—the opinion is based on Harris' subjective and unsupported

allegations[13] and is contrary to the record as a whole, including contemporaneously prepared

treatment notes.[14]  Tr. 83.  The ALJ evaluated Janecki's opinion in accordance with 20 C.F.R.

416.927(c) and explained why he rejected it, and, therefore, did not commit error.  *See Cruse v.

Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (holding that the ALJ must evaluate

"other source" opinions and provide some basis for rejecting them).

### C. The ALJ's RFC finding is supported by the state agency opinion

Harris submits that the ALJ gave significant weight to the state agency psychologist's

opinion but failed to formulate an RFC taking into account that opinion.  Doc. 19, p. 18-19.  The

state agency reviewing psychologist Dr. Stailey-Steiger opined,

> [Mr. Harris] presents as capable of tasks that do not require independent
> prioritization or more than daily planning.  He can interact occasionally in
> situations that do not require resolving conflict or persuading others to follow
> demands.  He can interact occasionally and superficially and receive instructions
> and ask questions appropriately in a work setting.  He can cope with the ordinary
> and routine changes in a work setting that is not fast paced or of high demand.

Tr. 388.  The ALJ's RFC limited Harris to performing "simple, routine, and repetitive tasks, in a

work environment free of fast paced production requirements, involving no more than occasional

---

[13]  For example, Janecki stated in her opinion that Harris avoids family gatherings and only spends time with family when he needs a ride.  Tr. 551.  Yet treatment notes reflect that Harris described his family to Dr. Ragothaman as "close-knit" (Tr. 428); he explained to Dr. Watkins that he maintains a close relationship with his nine siblings (Tr. 381; 84); and he traveled to California and Las Vegas on two separate occasions to visit family and stayed for one and two months, respectively (Tr. 434, 428).

[14]  Harris testified at his hearing that he goes to Zepf every two weeks for therapy (Tr. 17).  There is a treatment note signed by Janecki on September 14, 2010 (Tr. 533) and a reference to Harris seeing a therapist named "Judy" on February 22, 2011 (Tr. 523).

interpersonal interaction with the general public, coworkers, and supervisors, and requires a job working primarily with things or objects, rather than with people." Tr. 79.

Harris asserts that the ALJ "made no findings concerning Mr. Harris' ability to plan and prioritize work" and that, although "the ALJ addressed the frequency of interaction described by the State agency opinion, he does not address the quality of the interaction." Doc. 19, p. 19. This argument is misplaced. It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC. *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009). In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.* Here, the ALJ limited Harris to working with things or objects rather than people, accounting for the limitations regarding the quality of social interaction, i.e., not requiring an ability to resolve conflict or persuade others to follow demands. Additionally, the RFC provided for simple, routine and repetitive tasks, which account for Harris' limited ability to plan and prioritize work.

Harris also argues that the ALJ gave no indication that he recognized the state agency opinions were based on an incomplete record. This argument is baseless. The ALJ stated that he gave the state agency opinions significant weight, "as they had the opportunity to review the entirety of the record *available at that time* and their opinions are consistent with the objective mental findings of both consultative examiners and [Harris'] treating providers." Tr. 83 (emphasis added).

## VII.  Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's  decision.


Dated: September 17, 2014

KATHLEEN B. BURKE
U.S. Magistrate Judge